# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **JOANNA NELSON, PhD**, | Case No. 4:26-cv-04716 |
| Plaintiff, | |
| v. | **ORIGINAL COMPLAINT** |
| **WILLIAM MARSH RICE UNIVERSITY** | JURY TRIAL DEMANDED |
| Defendant. | |

## ORIGINAL COMPLAINT

Plaintiff Joanna Nelson, PhD ("Plaintiff" or "Dr. Nelson"), for her Original Complaint against William Marsh Rice University ("Defendant" or "Rice"), alleges as follows:

### I.      INTRODUCTION

1.      This is a civil action brought pursuant to the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), by Plaintiff Dr. Joanna Nelson ("Dr. Nelson") against Defendant William Marsh Rice University ("Rice University" or "Rice"), for retaliating against her after she reported and opposed Rice's fraudulent billing practices in connection with National Science Foundation ("NSF") grant funds.

2.      Dr. Nelson was hired as an Assistant Professor of Mathematics at Rice University in 2018. By all objective measures—including the assessments of multiple independent external letter writers, a prestigious Government NSF CAREER Award, and prior positive evaluations from her own Department Chair—Dr. Nelson was a distinguished scholar on track for tenure.

3. In December 2022, Dr. Nelson discovered that Rice was using funds from her NSF grant to pay graduate students for teaching duties wholly unrelated to the terms of the award—and that Rice was falsely certifying its compliance with NSF award conditions each time it drew down federal funds.

4. Dr. Nelson recognized this conduct as the same fraudulent billing scheme for which Rice had already paid more than $3.7 million to the United States in April 2020 to resolve allegations spanning from November 2006 through September 2018.

5. When Dr. Nelson opposed Rice's fraud against the United States, Rice chose to retaliate against her, rather than correcting the misconduct.

6. Her Department Chair, Alan Reid, was the person most directly implicated by Dr. Nelson's protected activity.

7. Immediately after learning of those disclosures, Reid began issuing negative performance evaluations that contradicted his prior glowing reviews, manipulated Dr. Nelson's tenure dossier by omitting favorable information and submitting a superseded, error-ridden version of her performance review, excluded a highly favorable letter from a respected senior colleague, and fabricated false statistics about her scholarly output.

8. These retaliatory acts infected the entire tenure review process and resulted in the denial of Dr. Nelson's tenure.

9. Rice's post-retaliation review mechanisms—its Faculty Senate Appeal Panel and the Office of the President—expressly declined to assess the merits of Dr. Nelson's tenure case on the grounds that their review was limited to selective procedural issues.

10.     The Faculty Senate and Appeal Panel and the Office of the President declined to consider the substantial body of evidence that Reid had retaliated against her, even though such retaliation is a violation of Rice policy.

11.     Reid resubmitted to the Faculty Senate Appeal Panel his superseded, error-ridden version of her performance review. The Faculty Senate Appeal Panel declined to recognize this as evidence of retaliation, despite the fact that Dr. Nelson had clearly explained it as part of her appeal of the tenure denial.

12.     As a result, Reid's retaliatory manipulation of the record went uncorrected, and the denial of tenure was upheld.

13.     Dr. Nelson seeks reinstatement with tenure, double back pay, front pay, compensatory damages for emotional distress and reputational harm, special damages including medical expenses, and attorney's fees and costs, as provided by 31 U.S.C. § 3730(h)(2).

## II.     PARTIES

14.     Plaintiff Joanna Nelson, PhD is an individual residing in Harris County, Texas. She is a mathematician and Rice professor whose research focuses on symplectic and contact geometry, which provides the theoretical framework for classical mechanical systems such as planetary motion.

15.     Defendant William Marsh Rice University ("Rice") is a private research university incorporated under the laws of the State of Texas, with its principal place of business at 6100 Main Street, Stop 70, Houston, Harris County, Texas 77005. Rice can be served through its registered agent for service, Omar Syed, 6100 Main St., 360 Allen Center, Houston, TX 77005.

### III.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(h).

17.     In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over any state law claims which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

18.     This Court has personal jurisdiction over Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts at issue occurred within this district.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in Harris County, which is within this District. Plaintiff is familiar with Defendant's fraudulent practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

### IV.     FACTUAL ALLEGATIONS

**A.     Rice University's History of NSF Grant Fraud**

20.     The NSF is an independent federal agency created by Congress to promote scientific progress. NSF funds support approximately twenty-four percent (24%) of all federally-supported basic research conducted at colleges and universities in the United States.

21.     University grantees receiving NSF funds—including Rice—operate under uniform administrative rules requiring that expenses charged to a grant be allocable—that is, incurred specifically for the award, actually benefiting the award, or necessary to the overall operation of the awardee and assigned in part to NSF in accordance with award terms.

4

22.     In 2016, federal authorities began an investigation of Rice's suspected misuse of NSF grant funds.

23.     The investigation revealed that from November 18, 2006, through September 30, 2018, Rice knowingly engaged in a pattern and practice of improperly charging graduate students' stipends, tuition remission, and related facilities and administrative charges to NSF research and development awards, when in fact those charges were used in part for time the graduate students spent performing teaching duties unrelated to Rice's NSF awards.

24.     Rice falsely certified on each grant proposal, and each time it requested a payment under the grant, that it was complying with NSF award terms and conditions—certifications Rice knew to be false.

25.     On or about April 15, 2020, Rice paid $3,754,186—double the loss to the United States—to resolve these False Claims Act allegations. The settlement was announced by the U.S. Attorney's Office for the Southern District of Texas. The NSF Office of the Inspector General conducted the underlying investigation.

26.     Notwithstanding this prior settlement and the magnitude of the sanctions imposed, Rice resumed the identical fraudulent billing conduct with respect to at least one NSF award—the NSF grant awarded to Dr. Nelson.

**B.      Dr. Nelson's Appointment and Exemplary Record**

27.     In 2018, Rice hired Dr. Nelson as an Assistant Professor in its Department of Mathematics. Dr. Nelson's research focuses on the rigorous analytical foundations of symplectic and contact geometry, a field of profound importance to modern mathematics.

28.     In 2022, Dr. Nelson received the National Science Foundation CAREER Award— the most prestigious honor the United States Government bestows on junior faculty who exemplify the role of teacher-scholars through research and education.

29.     NSF reviewers assessed her results and publications as "excellent," "significant," and "consequential," and noted she was publishing in "top-rated journals."

30.     Prior to Dr. Nelson's protected disclosures in December 2022, her Department Chair, Defendant's agent Alan Reid, consistently praised her work in annual performance reviews.

31.     In his January 2021 evaluation, Reid acknowledged that her papers were "long, technical and very often foundational," that her "output is solid, and in line with other young people in her area."

32.     In January 2022, Reid described her research as being "at the heart of contact geometry" and "instrumental in moving the field forward," calling her work "crucial."

33.     In March 2022, the Department of Mathematics provided Dr. Nelson a written outcome of department discussions stating: "The consensus among faculty is that you are on track towards promotion. . . . Most importantly, we are very happy to see that you are writing long, deep papers."

34.     The Department also stated it was considering advancing Dr. Nelson for early promotion in year four of a standard seven-year tenure clock.

35.     External letter writers from major research universities, having no connection to Reid or any internal Rice disputes, enthusiastically praised Dr. Nelson's scholarship when she was being considered for tenure.

36.     The internal reviewer summarized many of the comments from the external letter writers. He mentioned praise from the external letter writers about the length and complexity of her published work. She was praised for "extremely involved and technical theories, whose foundations require hundred [sic] of pages of hard mathematics." Many of the letter writers

commented positively on her research topic and the high level of detail and rigor it has. Some of them commented that she created, "a substantial body of work."

**C.      Dr. Nelson's Good-Faith Discovery of and Opposition to Rice's False Billing**

37.      In September 2022, Dr. Nelson discovered that two Neuroengineering students who were not in her department had been improperly "expensed to her NSF award" (i.e., had their salaries paid using funds from her NSF award) without any explanation, despite having no connection to her research.

38.      In December 2022, Dr. Nelson discovered that Rice was improperly using funds from her NSF grant to pay her former graduate student Dr. Leo Digiosia for teaching calculus classes—duties entirely unrelated to Dr. Nelson's NSF research award, which made using her NSF research award to pay his salary a violation of the NSF grant terms.

39.      Dr. Digiosia had graduated in August 2022; the NSF grant funds were designated for PhD student research funding, not for post-graduation teaching support.

40.      Department administrators Debra Purtee and Lisa Geda had prepared federal effort certification reports (i.e., certifications to the Government that NSF grant funds were used only for permissible purposes) for these improper charges and refused to provide Dr. Nelson with documentation showing how the funds from her NSF award were spent.

41.      Dr. Nelson recognized this conduct as the same pattern and practice for which Rice had already settled with the United States in 2020, and formed a good-faith, objectively reasonable belief that Rice was again violating the False Claims Act by falsely certifying compliance with NSF award terms in connection with improper expenditures.

42.      By expensing a Research Assistant's compensation 100% to an NSF grant, Rice represented to the Government that 100% of that Research Assistant's time was spent on matters within the scope of the grant.

43.     Reid knew that a Research Assistant ("RA") expensed 100% to an NSF grant could not be assigned to unrelated teaching duties. But he stated it was hard to avoid assigning RAs to unrelated teaching duties due to funding issues which pressured Rice to violate the terms of the NSF awards by improperly expensing 100% of the RA to the NSF grant, even though he was assigned to unrelated teaching duties.

44.     This was the same fraudulent conduct that led to Rice's 2020 settlement with the Government.

45.     Dr. Nelson repeatedly opposed these FCA violations to Rice.

46.     In October 2022, Dr. Nelson first informed her NSF Program Officers of Rice's False Claims Act violations, including the improper use of her NSF award funds.

47.     On December 16, 2022, Dr. Nelson engaged in additional protected activity under the FCA when she wrote to Reid to oppose the improper use of her NSF grant funds, expressly referencing the 2020 federal settlement and stating that Rice was engaging in the same type of false billing with respect to her NSF award.

48.     In December 2022, Nelson again informed her NSF Program Officers of Rice's False Claims Act violations.

49.     In December 2022, Dr. Nelson also refused to certify federal effort reports she knew to be false—a refusal that continued through at least July 2023—and explained that she was opposed to these false certifications to the Government.

50.     Reid reprimanded Dr. Nelson in writing in December 2022 and again in July 2023, threatening "disciplinary and/or corrective action" if she continued to refuse to sign the certifications.

51.     In December 2022, Dr. Nelson sought advice from senior faculty—including the Graduate Chair and multiple Professors in the Mathematics Department—regarding Reid's threats, the improper grant expenditures, and the false certifications about use of the NSF funds.

52.     In July 2023, Dr. Nelson again reported to her NSF Program Officers further instances of improper expensing, forwarding Reid's second written reprimand.

53.     The NSF Program Officers consulted with the NSF Division of Grants and Agreements, which directed Dr. Nelson to file a report with the NSF Office of Inspector General ("OIG").

54.     On August 1, 2023, Dr. Nelson filed a formal report with the NSF OIG, naming Dean Tom Killian as a witness.

55.     On August 21, 2023, Dr. Nelson was interviewed by an NSF OIG Special Agent, who informed her that the NSF OIG was considering opening another departmental and/or university-level investigation, based on Rice's pattern and practice of improperly charging NSF awards for activities not specifically incurred for, or benefiting, the research awards.

56.     Subsequent forensic accounting conducted from July through September 2023 revealed that Rice charged Dr. Nelson's NSF grant improperly at least sixty-six (66) times for amounts totaling over $40,000, without Dr. Nelson's knowledge or consent.

57.     In August 2023, Rice's General Counsel intervened to block the issuance of written clarification of the grant-charging policy to Dr. Nelson, directing that formal documentation would only be provided after the NSF issued a formal request to Rice's General Counsel.

58.     In September 2023, Dr. Nelson sought advice from the Milton B. Porter Professor Emeritus Mike Wolf, who is the current Department Chair at Georgia Tech.

59.    Professor Wolf informed her that it has been Rice Math Department policy to expense students to individual NSF grants as 100% Research Assistants (RA) while assigning them teaching duties commensurate with other PhD students in the program for as long as he could remember.

60.    Wolf told Dr. Nelson that his current Rice PhD student, Parker Evans, on his most recent grant NSF DMS-2005551 was assigned teaching duties despite being expensed as a 100% RA to his award, but that he had no recourse to do anything about it.

**D.    Reid's Retaliation Against Dr. Nelson**

61.    Reid was the person most directly implicated by Dr. Nelson's protected disclosures.

62.    He was the Department Chair who authorized and oversaw the improper charges to Dr. Nelson's NSF grant, issued the retaliatory reprimands threatening disciplinary action, and was identified as a wrongdoer in Dr. Nelson's NSF OIG complaint.

63.    Reid had every incentive to ensure that Dr. Nelson did not continue her employment at Rice.

64.    Reid's retaliatory intent is demonstrated by the dramatic and unexplained change in his written assessments of Dr. Nelson immediately following her protected disclosures.

65.    Before December 2022, Reid's written reviews of Dr. Nelson were consistently and specifically positive.

66.    After December 2022, his reviews became consistently and specifically negative, directly contradicting his prior assessments without any change in the record to justify his sudden change in attitude towards Dr. Nelson.

67.    In January 2023, Reid issued a retaliatory fifth-year performance review (the "January 12 Review") that omitted multiple positive items evidencing Dr. Nelson's research productivity, mentoring, and service contributions.

68.    The January 12 Review falsely stated that "Nelson completed no new papers in 2022," a demonstrably false statement.

69.    Dr. Nelson refused to sign this review, and Reid was forced to issue a corrected version on January 25, 2023 (the "January 25 Review"), which reluctantly acknowledged the omitted positive items.

70.    Despite having been compelled to issue the corrected January 25 Review, Reid subsequently submitted the incorrect, superseded January 12 Review to the Faculty Senate Appeal Panel during Dr. Nelson's tenure appeal, instead of the corrected January 25 version.

71.    The Appeal Panel cited the false information from the January 12 Review in its findings, including the false statement that Dr. Nelson had completed no new papers in 2022.

72.    Reid also reversed his prior favorable assessments of the quality of the journals in which Dr. Nelson published after Dr. Nelson's protected whistleblowing activity. Before Dr. Nelson became a whistleblower, Reid correctly characterized those journals as prestigious and acknowledged they were among the top journals in the field.

73.    After Dr. Nelson reported Reid's FCA violations and Reid began his campaign of retaliation, Reid reversed his characterization of the journals that published Dr. Nelson's papers, claiming that they were not top level. Nothing changed about the quality of the journals. Reid just changed his opinion of the journals as part of his efforts to diminish Dr. Nelson's achievements.

74.    Reid also changed his opinion regarding the quality of Dr. Nelson's research, going from praising its quality to disparaging its quality, after (and as a result of) Dr. Nelson's protected activity.

75.    Reid excluded from the tenure dossier a highly favorable letter from Professor Emeritus Mike Wolf—then Mathematics Department Chair at Georgia Institute of Technology, a

11

former full tenured professor at Rice for nearly 25 years, and two-time Rice Department Chair—despite previously committing to include Professor Wolf's letter.

76.     Professor Wolf had extensive direct knowledge of historical practices at Rice, the standards applied to mathematicians in Dr. Nelson's subfield, and Dr. Nelson's teaching record.

77.     His letter would have provided critical context for the majority of voting faculty who had not begun their appointments at Rice prior to 2020.

78.     Reid downplayed the uniformly favorable assessments of the external letter writers—none of whom had been influenced by Reid—by falsely characterizing their letters as "lacking superlatives."

79.     This characterization was demonstrably false: the letters contain numerous unqualified enthusiastic endorsements of Dr. Nelson's scholarship and explicit recommendations that she be promoted to Associate Professor with tenure.

80.     Reid downplayed Dr. Nelson's service and teaching contributions following her protected disclosures, despite having praised them extensively before December 2022.

81.     At the University Promotion and Tenure committee level, where the external letters were evaluated without Reid's direct influence, the letters were judged to be "strong." The internal evaluator concluded that Dr. Nelson had produced "a substantial body of hard, technical work, published in high quality journals."

82.     This assessment directly contradicted Reid's false characterization of her record to the department, the Council of Sciences, and University Levels.

**E.     Rice's Failure to Prevent Reid's Retaliation from Infecting the Tenure Process**

83.     Rice University knew, or should have known, that Reid was the primary target of Dr. Nelson's protected disclosures and that he had both the motive and the opportunity to retaliate against her through the tenure process. Notwithstanding this knowledge, Rice violated its own

policies by taking no action to recuse Reid, to limit his influence over the tenure decision, or to ensure that the process was conducted free of his retaliatory bias.

84.     In September 2023, Dr. Nelson met with Tom Killian (current Dean of Rice's Wiess School of Natural Sciences) to discuss concerns raised by senior faculty, including Kathleen Matthews (the former Dean of Rice's Wiess School of Natural Sciences) and Gloria Marí Beffa (Associate Dean of Research at the University of Wisconsin - Madison,) that implicit shifts in the tenure expectations in the Department, were never formally communicated to her, and appeared to directly target her, following Dr. Nelson's protected activity under the Federal False Claims Act.

85.      On August 1, 2023, Dr. Nelson had filed a report with the NSF Office of the Inspector General, naming Dean Tom Killian as a witness. Dr. Nelson informed Dean Killian in writing that she had listed him as a witness, stating: "There are some practices in the mathematics department that have made me uncomfortable, so I did not list Alan [Reid, the Department Chair] as a witness. (For example, the mathematics department is expensing graduate students as Research Assistants to personal and NSF RTG [National Science Foundation Research Training Group] awards when they still have the same teaching and grading duties as the other PhD students in the mathematics program who are not supported on NSF awards.)"

86.     Reid was a voting faculty member in the tenure decision. He controlled the contents of Dr. Nelson's tenure dossier—including what was included, what was omitted, and which version of the performance review was submitted.

87.     He was in the primary position to influence the other voting faculty members' assessments of Dr. Nelson's record.

88.     On May 6, 2025 Rice issued a negative tenure decision for Dr. Nelson.

89.     Dr. Nelson appealed the decision on August 11, 2025, pointing out the numerous improprieties in the process, including Reid's motive to retaliate against Dr. Nelson, and the many ways in which Reid improperly skewed the process and the record against Dr. Nelson, including: (a) issuing false and negative annual performance reviews in January and March 2023 that contradicted prior positive evaluations; (b) submitting the superseded, erroneous January 12 Review to the tenure decision-makers (and subsequently to the Appeal Panel, which it cited in their rationale for upholding the tenure denial) in place of the corrected January 25 Review; (c) excluding Professor Wolf's favorable letter from the tenure dossier; (d) mischaracterizing the external letter writers' uniformly supportive assessments; and (e) reversing prior favorable assessments of the journals in which Dr. Nelson published.

90.     A committee consisting of three tenured Rice faculty members (the "Appeal Panel") considered Dr. Nelson's appeal of her tenure denial.

91.     As acknowledged in the Appeal Panel's report, "many or most faculty voting had no knowledge of these issues" regarding Dr. Nelson's opposition to Rice's NSF grant fraud, which by implication means some of the voting faculty did have such knowledge.

92.     The Appeal Panel, in reviewing Dr. Nelson's appeal of the tenure denial, expressly declined to assess the underlying merits of Dr. Nelson's tenure case.

93.     The Appeal Panel limited its review to whether only a selective "material violation of policy or process" had occurred. It concluded, in an October 10, 2025 report that none of the appellant's claims met the dual criterion of (i) sufficient evidence to indicate a violation of policy or process that (ii) meaningfully affected the ultimate tenure decision.

94.     Based on this limited review, it recommended that the President uphold the decision of the Promotion and Tenure committee to deny Dr. Nelson tenure.

14

95.    On October 16, 2025, the President of Rice University followed the October 10 recommendation of the appeal panel and upheld the decision not to grant tenure to Dr. Nelson, notifying her that his decision is final.

96.    Like the appeal panel, the University President similarly declined to assess the substantive merits of Dr. Nelson's qualifications for tenure, characterizing his review as "limited to procedural issues" and taking no independent action to remedy Reid's retaliation.

97.    The President concluded: "I do note that your contributions of new courses and revisions of existing ones have positively impacted the department's offerings to undergraduate and graduate students. Your service contributions have also been highly valued."

98.    The President's office thus, by his own admission, provided no meaningful check on Reid's retaliatory conduct or substantive review of Dr. Nelson's case for tenure, despite the fact that Reid's retaliation violated Rice's policy.

99.    The combination of Reid's controlling role in the tenure process, the absence of any remedial action by Rice, and the selectively procedurally-limited nature of Rice's appeal mechanisms enabled Reid's retaliatory motive to infect and determine the outcome of Dr. Nelson's tenure review without any corrective review of the substantive merits.

100.    Reid was acting within the scope of his employment when he participated in the process that resulted in the decision to deny tenure to Dr. Nelson.

101.    Rice knew about (or negligently or recklessly failed to discover) and remedy Reid's bias.

102.    The final decision-makers (including the voting faculty, Appeal Panel, and President) relied on information that Reid tainted, proximately causing the adverse action.

15

## V.   CAUSE OF ACTION

**Count I: Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)**

103.   Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

104.   The FCA's anti-retaliation provision, 31 U.S.C. § 3730(h)(1), prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of the employee's lawful acts in furtherance of an FCA action, or other efforts to stop one or more violations of the FCA.

105.   Dr. Nelson engaged in protected activity within the meaning of 31 U.S.C. § 3730(h) when she: (a) opposed Rice's improper expensing of her NSF grant funds to her Department Chair; (b) refused to certify federal effort reports she knew to be false; (c) reported Rice's False Claims Act violations to her NSF Program Officers; (d) filed a formal complaint with the NSF Office of Inspector General; and (e) participated in an NSF OIG investigation.

106.   These actions were motivated by Dr. Nelson's good-faith and objectively reasonable belief that Rice was violating the FCA by falsely certifying compliance with NSF award terms while using those funds for unallowable purposes.

107.   Rice University, through its agent Alan Reid and through institutional action and inaction, knew of Dr. Nelson's protected activity.

108.   Reid knew because Dr. Nelson expressly opposed his conduct in writing, naming him as the responsible party. The persons who voted to deny Dr. Nelson tenure knew of her protected activity. The Faculty Senate Appeal Panel acknowledged this in its report.

109.   Rice retaliated against Dr. Nelson because of her protected activity, in violation of 31 U.S.C. § 3730(h).

110.   The retaliatory acts include but are not limited to: (a) submitting the superseded, erroneous Review to the tenure decision-makers and Appeal Panel in place of the corrected Review; (b) excluding Professor Wolf's favorable letter from the tenure dossier; (c) mischaracterizing the external letter writers' uniformly supportive assessments; (d) reversing prior favorable assessments of the journals in which Dr. Nelson published; (e) threatening disciplinary action for Dr. Nelson's refusal to sign false federal certifications; (f) influencing other voting faculty to vote to deny Dr. Nelson tenure, resulting in the denial of tenure; and (g) denying Dr. Nelson tenure.

111.   Dr. Nelson's denial of tenure—communicated to her on May 6, 2025, and made final by the President of Rice University on October 16, 2025—was the culminating adverse employment action produced by Reid's retaliation. As described above, Reid's retaliatory conduct extended into the appeal process itself, including during Dr. Nelson's 2025 tenure appeal, by resubmitting to the Faculty Senate Appeal Panel the superseded, error-ridden January 12 Review in place of the corrected January 25 Review, which false information in that superseded review was relied upon in the October 10, 2025 report recommending that the denial of tenure be upheld.

112.   The causal connection between Dr. Nelson's protected activity and the adverse employment action is established both by temporal proximity and by the unbroken chain of retaliatory conduct that followed her disclosures. Dr. Nelson's protected activity was not confined to December 2022; it continued throughout 2023, including her refusal to certify false federal effort reports through at least July 2023, her reports to her NSF Program Officers, her August 1, 2023 complaint to the NSF Office of Inspector General, and her August 21, 2023 OIG interview.

113.   Reid—the person most directly implicated by that activity—began issuing demonstrably false negative assessments of Dr. Nelson immediately after her December 2022

17

disclosures, and he thereafter controlled and tainted the inputs to her tenure review, including by submitting the superseded, error-ridden January 12 Review to the tenure decision-makers and, during the 2025 appeal, to the Faculty Senate Appeal Panel. Through this subordinate-bias mechanism, Reid's retaliatory animus proximately caused the adverse employment action.

114.    Rice's stated reason for denying Dr. Nelson tenure—that her record did not merit tenure—is a pretext.

115.    The objective record, including the assessments of external reviewers, Dr. Nelson's receipt of the NSF CAREER Award, prior positive internal evaluations, and the University-level review of her external letters, all demonstrate that Dr. Nelson's record more than merited tenure.

116.    The pretextual nature of Rice's stated reason is further established by Reid's false statements, fabricated statistics, and selective omissions designed to undermine her record.

## VI.    DAMAGES

117.    As a direct and proximate result of Rice's retaliatory actions, Dr. Nelson has suffered and continues to suffer substantial damages.

118.    Under 31 U.S.C. § 3730(h)(2), Dr. Nelson is entitled to: (a) reinstatement with the same seniority status she would have had but for the retaliation; (b) two times the amount of back pay; (c) interest on the back pay; and (d) compensation for special damages sustained as a result of the retaliation, including litigation costs and reasonable attorney's fees.

119.    Dr. Nelson's economic damages include: (a) the loss of tenure, including lost salary at the tenured Associate Professor level retroactive to July 1, 2025, including the standard nine to ten percent salary increase awarded to newly tenured faculty in the Mathematics Department; (b) loss of all benefits, retirement contributions, and other compensation associated with a tenured position; and (c) lost future earnings and career opportunities resulting from the denial of tenure.

120.    As a direct result of Rice's retaliation, Dr. Nelson has suffered severe emotional distress, mental anguish, and humiliation, accompanied by physical manifestations that have required medical care, as well as reputational harm. These injuries, including the medical expenses Dr. Nelson has incurred and continues to incur, were sustained as a result of the retaliation and are recoverable as damages under 31 U.S.C. § 3730(h)(2).

121.    The doubling of back pay damages is mandatory under 31 U.S.C. § 3730(h)(2).

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joanna Nelson, PhD, respectfully requests that this Court enter judgment in her favor and against Defendant William Marsh Rice University, and award the following relief:

a.    A declaration that Rice University violated 31 U.S.C. § 3730(h) by retaliating against Dr. Nelson for her protected activity under the False Claims Act;

b.    Reinstatement of Dr. Nelson to the position of Associate Professor with tenure in the Rice University Department of Mathematics, with the same seniority she would have had but for the retaliation, retroactive to July 1, 2025, with all associated benefits including the standard salary increase;

c.    In the alternative, if reinstatement is not feasible or appropriate, an award of front pay sufficient to compensate Dr. Nelson for the loss of her tenured position;

d.    An award of two times the amount of back pay, including all salary, benefits, and compensation Dr. Nelson lost as a result of Rice's retaliation, plus interest, as required by 31 U.S.C. § 3730(h)(2);

e.    Compensation for special damages, including emotional distress, mental anguish, physical manifestations of distress, medical expenses, and reputational harm;

19

f.      Reasonable attorney's fees and litigation costs as provided by 31 U.S.C. § 3730(h)(2);

g.      Injunctive relief requiring Rice to: (i) recuse Alan Reid from all discussions, evaluations, and votes concerning Dr. Nelson's performance reviews, salary, and promotion; (ii) include a statement of Rice's retaliatory conduct in any future promotion dossiers; (iii) implement adequate oversight to prevent retaliatory interference in future performance evaluations; and (iv) include the University Ombudsperson and an external mathematics professor in any future promotion discussions and votes concerning Dr. Nelson; and

h.      Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues triable to a jury.

Dated: June 15, 2026.

Respectfully submitted,

/s/ Cory S. Fein
Cory S. Fein
Cory Fein Law Firm
13105 Northwest Fwy, Ste 705
Houston, TX 77040
(713) 730-5001
(530) 748 - 0601 (fax)
cory@coryfeinlaw.com

*For Plaintiff Joanna Nelson*

20